## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LEROY RICHARDSON-BEY,       )
                           )
          Plaintiff,     )
                           )
          v.             )       1:23cv138
                           )
WARDEN M. SHELTON,         )
                           )
          Defendant.     )

## <u>MEMORANDUM OPINION AND RECOMMENDATION</u>
## <u>OF UNITED STATES MAGISTRATE JUDGE</u>

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion for Summary Judgment" (Docket Entry 42 (the "Motion") at 1 (all-cap and bold font omitted))[1] filed by Melanie Shelton (the "Defendant" or "Warden Shelton"). For the reasons that follow, the Court should deny the Motion.

## <u>BACKGROUND</u>

Alleging violations of his rights during his incarceration with the North Carolina Department of Adult Corrections (the "DAC"), Leroy Richardson-Bey (the "Plaintiff") sued, inter alia, Defendant, formerly the warden at Sanford Correctional Center (at times, the "SCC"). (See generally Docket Entries 1, 8; see also Text Order dated Feb. 1, 2024 (reflecting that "a Special Deputy Attorney General for the State of North Carolina . . .

---

[1] Docket Entry page citations utilize the CM/ECF footer's pagination.

notif[ied] the Court that [Warden] Shelton had 'retired'").)
Having reviewed Plaintiff's pleadings pursuant to 28 U.S.C. § 1915A
(see generally Docket Entry 10) (the "Recommendation"), the Court
(per United States District Judge William L. Osteen, Jr.) allowed
Plaintiff to pursue his "individual capacity retaliation claim
against Defendant" (Docket Entry 14 at 1 (adopting Recommendation))
for allegedly transferring Plaintiff from SCC in connection with an
incident, about which Plaintiff complained to Defendant (see Docket
Entry 10 at 5), in which SCC "Sgt. Watson ordered Plaintiff to
remove all of his religious materials from the table [in the SCC I-
Dorm dayroom] where [Plaintiff] was praying and studying and stated
that if [Plaintiff] did not, [Sgt.] Watson would put them in a
garbage bag" (id.), a directive with which "Plaintiff complied"
(id.).

    The parties subsequently engaged in discovery (see, e.g.,
Docket Entry 45-1, ¶ 17 (averring that Plaintiff "requested a copy
of the letters [he] sent to Warden Shelton in discovery")), after
which Defendant "move[d] for summary judgment as to all claims
against her" (Docket Entry 42 at 1).  In support of that request,
Defendant submitted a grievance that Plaintiff filed related to the
transfer and the official responses thereto.  (See Docket Entry 43-
1; see also Docket Entry 45-1 at 6-12 (authenticating materials).)
Defendant also submitted an unsworn document entitled "Statement of
the Facts" (Docket Entry 43-2 at 2 (all-cap font omitted)) that

Plaintiff appears to have submitted to prison officials in or before March 2022 (see id. at 5).[2] As relevant to the Motion (see Docket Entry 43 at 2, 5 (citing document)), this document states that, while "[Plaintiff] was practicing [Plaintiff's] faith in the I-dorm dayroom[,] Sgt[.] Watson ordered [Plaintiff] to remove [Plaintiff's] religious items from a table in the I-dorm dayroom because [Sgt. Watson] said that [Plaintiff] was building a shrine[. Plaintiff] obeyed [Sgt. Watson's] orders." (Docket Entry 43-2 at 2.) Finally, Defendant submitted a document purporting to outline SCC's "Standard Operating Procedures" (Docket Entry 43-3 at 2 (bold font omitted)) regarding "Religious Services" (id. (bold font omitted)) as of March 2021 (see id. at 2-4).[3]

Plaintiff filed a response in opposition to the Motion (Docket Entry 45) (the "Opposition"). To support his Opposition, Plaintiff submitted a personal affidavit, to which he attached his grievance and the associated responses, as well as apparent responses by Defendant to certain requests for admission. (See Docket Entry 45-

---

2 Defendant did not authenticate this document. (See Docket Entries 42 to 43-3.) However, Plaintiff does not dispute its authenticity (see Docket Entry 45 at 11 ("In his grievance, Plaintiff conveyed that 'Sgt. Watson ordered [Plaintiff] to remove [his] religious items because [Sgt. Watson] said that [Plaintiff] was building a shrine.'" (quoting Docket Entry 43-2 at 1))), and Plaintiff reiterates the pertinent information in his affidavit (see Docket Entry 45-1, ¶¶ 6-11).

3 Defendant likewise failed to authenticate this document (see Docket Entries 42 to 43-3), but, for the reasons discussed herein, these policies do not affect the Motion's resolution.

3

1 (the "Affidavit") at 1-14.)[4]  Defendant filed no reply to the

Opposition.  (See Docket Entries dated Apr. 15, 2025, to present

(lacking filings from Defendant).)

As relevant to the Motion, the Affidavit states:

[Plaintiff, a DAC inmate] was housed at Sanford
Correctional Center from 2018 to 2021. . . .

Now, and at the time of the events giving rise to
this [Affidavit, Plaintiff has been] a practicing Muslim.
While at Sanford Correctional Center, several inmates,
including [Plaintiff], had claimed their own day room
table within the I-dorm by using a specific table for an
extended period and keeping [their] personal belongings
on the table.

Although the day room tables were unassigned, the
unofficial seating arrangement among the inmates was
respected within the I-dorm.

On the day room table [that Plaintiff] had claimed,
[Plaintiff] kept Muslim religious books, notes from [his]
study of Muslim religious books, and pictures of
respected figures within [his] Muslim faith.  During
[his] time at Sanford Correctional Center, from 2018 to
2021, [Plaintiff] daily prayed and studied Muslim
religious materials at [his] table in the I-dorm day room
without interference from prison staff.  Part of
[Plaintiff's] daily religious practice at [his] claimed
day room table included praying at the table five times
a day with [his] religious materials which included
reading Muslim religious books, taking notes from [his]
study of Muslim religious books, using [his] prayer rug,
and looking at pictures of respected figures within [his]
faith.

Prior to the incident on October 30, 2021,
[Plaintiff] engaged in this practice of daily prayer,

_____

4  Plaintiff did not authenticate these responses.  (Compare
Docket Entry 45-1 at 1-8 (lacking reference to Exhibit E), with id.
at 13-14 (bearing "Plaintiff's Exhibit E" label (all-cap and bold
font omitted)).)  As detailed herein, however, Plaintiff does not
need these admissions to survive summary judgment.

study, and meditation at [his] table with [his] religious materials on a daily basis beginning a few months after [his] arrival at Sanford Correctional Institute [sic] in 2018.

[Plaintiff] had finished prayer and gone to lunch in the chow hall when Sergeant Watson approached [Plaintiff] and told [Plaintiff that he] needed to remove [his] religious materials from [his] table in the I-[d]orm day room.

The religious materials [Sergeant Watson] ordered [Plaintiff] to remove had been on [Plaintiff's] table throughout [Plaintiff's] time at Sanford Correctional Center, since a few months after [Plaintiff's] arrival in 2018.

[Plaintiff] approached Sergeant Watson in his office and explained that [Plaintiff] believed [Sergeant Watson] was discriminating against [Plaintiff] because the Christians had their religious materials on [their] tables and others had art supplies on their tables, and [Plaintiff] believed [Plaintiff] was being singled out because [Plaintiff is] Muslim.

[Sergeant Watson] said that [Plaintiff's] materials were a "shrine" and that if [Plaintiff] did not remove them [Sergeant Watson] would throw them in the garbage.

[Plaintiff] did not have a shrine in the I-dorm day room. [Plaintiff] was simply sitting at the table in the I-dorm day room with [his] Muslim religious materials, studying and praying, as [Plaintiff] had done consistently since [Plaintiff's] arrival to Sanford Correctional Center in 2018. [Plaintiff] disagree[s] with Sergeant Watson's characterization of [Plaintiff's] religious materials as a "shrine." The word "shrine" is not used by faith [sic] to describe the use of [Plaintiff's] space for religious prayer, study, and meditation.

In response to Sergeant Watson's order, [Plaintiff] removed [his] religious materials from the day room table and put them in [his] locker.

Caucasian inmates housed with [Plaintiff] in I-dorm were practicing Christianity and also maintained unofficial possession of their own day room tables and

5

used these tables to practice their religion in a manner similar to [Plaintiff]. They were never ordered to remove their religious materials from their day[ ]room tables while in the I-dorm, nor were they threatened with destruction of their religious materials.

Further, on Sundays, inmates in [Plaintiff's] area of I-dorm who practiced Christianity used the I-dorm day room for religious purposes without interference from prison staff. Specifically, inmates practicing Christianity would push tables together to read their Bible, study Christian religious materials, sing Christian hymns, and engage in prayer together in the I-dorm day room.

On November 7, 2021, [Plaintiff] wrote a letter to Warden Shelton, Warden of Sanford Correctional Center, to notify her of Sergeant Watson's actions on October 30, 2021, specifically that Sergeant Watson[] ordered [Plaintiff] to remove all of [his] religious materials from the day room table and threatened [him] with the destruction of [his] religious materials.

In the letter [Plaintiff] informed Warden Shelton that [he] believed [Sergeant] Watson's order to remove [his] religious materials discriminated against [him] on the basis of religio[n] and race. [Plaintiff] wrote to her that this was an abuse of power and authority. [Plaintiff] told her that [he] had been engaged in the same practice with the same materials for many months with no problem.

On November 14, 2021, [Plaintiff] wrote a second letter to Warden Shelton in regard to Sergeant Watson's actions on October 30, 2021 and reiterating [Plaintiff's] concerns.

[Plaintiff] requested a copy of the letters [he] sent to Warden Shelton in discovery and they were not produced.

On November 17, 2021, three days after [Plaintiff's] second letter to Warden Shelton, Warden Shelton ordered [Plaintiff's] transfer from Sanford Correctional Center to Richmond Correctional Institution[ (at times, the "RCI")].

6

On November 17, 2021, a [DAC] officer removed [Plaintiff] from [his] work release assignment and brought [him] back to Sanford Correctional Center to prepare for the transfer.

At Sanford Correctional Center, [Plaintiff] participated in the institution's work release program. However, following Warden Shelton ordering [Plaintiff's] transfer, [Plaintiff] was moved to Richmond Correctional Institution, an institution that does not provide a work release program. As a result of [his] transfer, [Plaintiff] lost the ability to participate in work release.

Before [he] was transferred from Sanford Correctional Center, [Plaintiff] had begun the process for the Mutual Agreement Parole Program (MAPP). Under the MAPP agreement, work release is one factor considered in reducing jail time and setting a parole date.

Losing the ability to participate in work release significantly delayed [Plaintiff's] MAPP agreement and negatively impacted [his] parole by pushing [his] potential parole date further into the future.

Further, [Plaintiff's] inability to participate in work release resulted in lost wages. [Plaintiff] was earning $420 per month, and ha[s] lost those wages for more than 36 months since losing work release November 17, 2021.

On December 2, 2021, [Plaintiff] filed a formal grievance, Grievance No. 3930-2021-JEA-16371, against Warden Shelton regarding [his] transfer from Sanford Correctional Center to Morrison [sic] Correctional Institution. *See* Plaintiff's Exhibit A.[5]

---

5    Filed at "Richmond CI" (Docket Entry 45-1 at 9), the grievance states: "Because I sought to practice [and] exercise my religious faith[,] Warden Shelton of [SCC] ordered me to be transfer[r]ed here[, w]hich is a violation of my First Amendment religious rights of the U.S. Constitution." (<u>Id.</u> (certain capitalization altered).)  To resolve his grievance, Plaintiff asked for officials to "[p]lace [him] back on [his] work release [j]ob." (<u>Id.</u>)

In response to [Plaintiff's] December 2 grievance, Assistant Warden Parrish denied [Plaintiff's] grievance, stating in the Step One Unit response on January 4, 2022, "[Plaintiff] FEELS THAT THE WARDEN IS DISCRIMINATING AGAINST HIS RELIGION BECAUSE THEY WILL NOT ALLOW HIM TO ERECT A "SHRINE" IN THE DAYROOM. THE WARDEN DOES NOT ALLOW ANY FAITH TO USE THE DAY ROOM AS A MEANS TO DISPLAY THEIR RELIGIOUS FAITHS. THEREFORE, IT HAS BEEN DETERMINED THAT IN ORDER TO NOT UNDERMINE THE FACULTY [sic] AUTHORITY [Plaintiff] SHOULD BE TRANSFERRED TO ANOTHER FACILITY." *See* Plaintiff's Exhibit B.

[Plaintiff] was not "erecting a shrine" in the I-dorm day room. [Plaintiff] was sitting at the same table in the I-dorm day room with the same religious items that had consistently been on the day room table since a few months after [Plaintiff's] arrival at Sanford Correctional Center in 2018.

The second denial of Grievance No. 3930-2021-JEA-16371, [Plaintiff's] formal grievance against Warden Shelton regarding [Plaintiff's] transfer from Sanford Correctional Center, came on March 1st, 2022, by Gutierrez, Assistant Warden under [Warden] Shelton at Sanford Correctional Center. In his Step Two Institution Response on [sic] Gutierrez stated: "In response to your grievance, you transferred as part of a swap request from another facility. You met all criteria for the swap and it was agreed upon by both facilities. You spent two years at Sanford C[orrectional Center] without issue however housing assignments are not guaranteed and are based on institutional, regional, and divisional needs." Most notably, Gutierrez['s] response to [Plaintiff's] grievance stated in [sic] that [Plaintiff] had spent two years at Sanford C[orrectional Center] without issue. *See* Plaintiff's Exhibit C.

Based on the statements made in the Step One Unit Response by Assistant Warden Parrish and the Step Two Institution Response by Assistant Warden Gutierrez, [Plaintiff's] transfer from Sanford Correctional Center to Richmond Correctional Institution was solely because of the two letters [Plaintiff] sent to Warden Shelton complaining about Sergeant Watson's actions on October 30, 2021, and there is no other legitimate reason for [Plaintiff's] transfer besides [Plaintiff's] complaints.

8

On March 2nd [sic], 2022, Grievance No. 3930-2021-JEA-16371, [Plaintiff's] formal grievance against Warden Shelton, was denied for the third time by Kimberly D. Grande, Inmate Grievance Examiner for the [DAC]. Grande reasoned that her review of the record found no violation of applicable prison policy, nor any evidence of misconduct by prison staff. Exhibit D.[6]

Between January and March of 2022, [Plaintiff's] formal grievance against Warden Shelton regarding [his] transfer from Sanford Correctional Center to Morrison [sic] Correctional Institution, Grievance No. 3930-2021-JEA-16371, was received by Assistant Warden Parrish, Assistant Warden Gutierrez, and Inmate Grievance Examiner Grande, and denied a total of three times, once by Parrish, Gutierrez, and Grande.

[Plaintiff] was transferred and lost work release in retaliation for complaining to Warden Shelton about the denial of [Plaintiff's] religious freedom and racial discrimination.

(Docket Entry 45-1, ¶¶ 1-31 (internal paragraph numbering omitted) (all-cap font and double quotation marks in original).)

## DISCUSSION

### I. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the

---

6 This response bears a date of March 21, 2022. (See Docket Entry 45-1 at 12 (bearing grievance received date of March 2, 2022).)

9

absence of such dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him."  Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (internal quotation marks omitted) (brackets in original).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper."  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Finally, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury.  See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011); see also United States v. White, 366 F.3d 291, 300-01 (4th Cir. 2004) (denying summary judgment where "[t]he Government's claimed entitlement to summary judgment rests largely on its

10

repeated contention in court submissions that it did not orally agree to a conditional plea," explaining that "an attorney's unsworn argument does not constitute evidence, and the Government has offered no affidavit, deposition, sworn statement, or other direct evidence that a Government agent did not make the oral promise"); Rountree v. Fairfax Cnty. Sch. Bd., 933 F.2d 219, 223 (4th Cir. 1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact."). As such, "the unsworn statements in [a party's] grievances and [summary judgment] brief generally do not constitute admissible evidence." Bowman v. Johnson, No. 3:08cv449, 2011 WL 1167320, at *8 n.9 (E.D. Va. Mar. 24, 2011).

## II. Analysis

As Defendant concedes, "[f]or an inmate to prove a First Amendment retaliation claim, he must prove '(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct.'"[7]  (Docket Entry 43 at 4 (quoting

---

7  This standard governs first-amendment retaliation claims generally, not just for inmates. See, e.g., Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005) (outlining same test for law school student's first-amendment (continued...)

11

<u>Martin v. Duffy</u>, 858 F.3d 239, 249 (4th Cir. 2017)).)  "That said"

(<u>id.</u>), Defendant maintains,

> inmate claims of retaliation are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct."  *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

(Docket Entry 43 at 4-5 (brackets in original).)  This contention

misses the mark.

In a recent decision reversing the grant of summary judgment

to a prison official on an inmate's first-amendment retaliatory

transfer claim, the United States Court of Appeals for the Fourth

Circuit "note[d] that the district court's analysis may have been

affected by its statement that '[i]n the prison context,

retaliation claims are treated with skepticism.' *Id.* at *9 (citing

*Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994))." <u>Jones v. Solomon</u>,

90 F.4th 198, 215 (4th Cir. 2024) (second set of brackets in

original); <u>see</u> <u>id.</u> at 202.  The Fourth Circuit continued:

> To be sure, [the Fourth Circuit's] 1994 opinion in *Adams v. Rice* and a later en banc case, *Cochran v. Morris*, contain statements to that effect.  *See Adams*, 40 F.3d at 74 ("Claims of retaliation must . . . be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."); *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (same).  But *Adams* and *Cochran* are distinguishable.  In both cases, [the Fourth Circuit] w[as] engaging in the highly deferential review of a dismissal of claims as "frivolous" pursuant to 28 U.S.C.

---

7(...continued)
retaliation claim against school officials).

12

§ 1915, and [it] affirmed that dismissal where the
plaintiff's complaint rested on generalized grievances or
a broad-strokes conspiracy allegation. *See Adams*, 40
F.3d at 74-75; *Cochran*, 73 F.3d at 1317-18. *Adams*
emphasized that a prisoner cannot just throw out an
accusation of retaliation without any allegation as to
"how or why [the] defendants retaliated against" him,
*Adams*, 40 F.3d at 74, and *Cochran* rejected the
plaintiff's "assortment of vague accusations," *Cochran*,
73 F.3d at 1318.

But the concerns underlying *Adams* and *Cochran* — that
the federal courts not be used as fora to litigate every
little inmate grievance dressed up as a retaliation claim
— are not implicated by this case. Jones[, the inmate-
plaintiff,] has made a specific claim of retaliation
related to specific protected activity that survived
§ 1915 review, and his claim is now being addressed at
the summary judgment stage. *Adams* and *Cochran* speak to
how courts are to evaluate prisoners' retaliation claims
when conducting § 1915 frivolity review; they do not mean
that such claims are treated differently from others for
the life of the litigation.

Jones, 90 F.4th at 215-16 (footnote omitted) (ellipsis and

penultimate set brackets in original).

## A. Protected Activity

Turning to the components of Plaintiff's retaliatory transfer

claim, Defendant first asserts that "Plaintiff did not engage in

protected First Amendment activity." (Docket Entry 43 at 5

(underscoring omitted) (capitalization altered).) More

specifically, Defendant maintains:

Here, Plaintiff was not just merely praying in the
I-Dorm dayroom, he was attempting to build a shrine.
Ex. 1. Indeed, Plaintiff admitted in a grievance that
Sgt. Watson ordered [Plaintiff] to remove his religious
items because Sgt. Watson believed [Plaintiff] was
building a shrine. Ex. 2 at 1. Moreover, Plaintiff also
admitted in a grievance that he was "doing the same
thing" as the Christian Sunday school and bible study.

13

Yet under the SCC unit services schedule the Islamic services took place on Tuesdays and Fridays. Ex. 3. And October 30, 2021 was a Saturday. Plaintiff thus was attempting to hold an Islamic service during an unauthorized time. Simply put there is no evidence here that [Warden] Shelton or anyone at SCC was attempting to prevent Plaintiff from exercising his First Amendment rights of freedom to worship. Rather, there was a legitimate penological reason to stop Plaintiff from building a shrine or conducting a service at an unauthorized time in the dayroom used by the prisoners in the unit.

In sum, Plaintiff did not engage in protected First Amendment activity.

(Docket Entry 43 at 5-6 (footnote noting court can take judicial notice of days of week omitted).)

As an initial matter, Defendant provides no source citation for her assertion that "Plaintiff also admitted in a grievance that he was 'doing the same thing' as the Christian Sunday school and bible study" (id.), and that statement does not appear in the legible portions of the ostensibly grievance-related materials that Defendant submitted in support of the Motion (see Docket Entries 43-1, 43-2). As the Federal Rules of Civil Procedure make clear, Defendant bears the burden of "citing to particular parts of materials in the record" to support her assertions, Fed. R. Civ. P. 56(c)(1)(A), and "[t]he [C]ourt need consider only the cited materials [in ruling on a summary judgment motion]," Fed. R. Civ. P. 56(c)(3). Further, the fact that the record contains prison officials' unsworn characterizations of Plaintiff's actions as building a shrine does not establish that Plaintiff engaged in

14

shrine-building.  See, e.g., Reeves, 2011 WL 4499099, at *5 n.14;
Bowman, 2011 WL 1167320, at *8 n.9.  Regardless, Plaintiff avers
that he "did not have a shrine in the I-dorm day room," but instead
"was simply sitting at the table in the I-dorm day room with [his]
Muslim religious materials, studying and praying."  (Docket Entry
45-1, ¶ 10.)  "There can be no doubt that the First Amendment
protects the right to pray.  Prayer unquestionably constitutes the
'exercise' of religion." Sause v. Bauer, 585 U.S. 957, 959 (2018).
Thus,  even  accepting  Defendant's  unsworn  descriptions  of
Plaintiff's actions as evidence, "there is at least a genuine
dispute of material fact," Jones, 90 F.4th at 213, as to whether
Plaintiff engaged in protected religious activity.

    Moreover, Plaintiff asserts that, "separate and apart from his
religious  claim,"  he  "engaged  in  protected  First  Amendment
[a]ctivity by complaining to Defendant" in his November letters
"about Sgt. Watson's threat to throw away his religious materials."
(Docket Entry 45 at 13; see Docket Entry 45-1, ¶¶ 14-16.)  By
failing to reply to the Opposition (see Docket Entries dated Apr.
15, 2025, to present), Defendant conceded this argument, see, e.g.,
Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL
1667285, at *8 (M.D.N.C. Apr. 23, 2010) (explaining that "a party
who fails to address an issue has conceded the issue") (collecting
cases.  In any event, "[t]he First Amendment protects the right to
petition the Government for a redress of grievances." Martin, 858

F.3d at 249 (internal quotation marks omitted). "[P]risoners retain this constitutional right while they are incarcerated." Id.; see also, e.g., Jones, 90 F.4th at 213 ("filing grievances is a protected activity"). This right extends to petitions outside the prison's formal grievance procedure. See, e.g., Patton v. Kimble, 717 F. App'x 271, 272 (4th Cir. 2018) (concluding that prisoner's alleged "verbal complaint to [officer's] supervisor" qualified as protected first-amendment activity); Martin, 858 F.3d at 249 (concluding that prisoner plausibly alleged first-amendment retaliation claim where he allegedly "attempted to informally resolve a grievance" by "fil[ing] an electronic kiosk message against a prison sergeant [for battery]" (internal quotation marks and brackets omitted)). Thus, Plaintiff's complaints to Defendant regarding the dayroom incident qualify as protected first-amendment activity. (See Docket Entry 45-1, ¶¶ 14-16 (describing letters).)

Accordingly, construing the record in the light most favorable to Plaintiff, he "has satisfied the first prong of th[e first-amendment retaliation] test," Jones, 90 F.4th at 213.

## B. Adverse Action

Defendant next maintains that Plaintiff did not suffer an adverse action. (See Docket Entry 43 at 6-8.) "For purposes of a First Amendment retaliation claim under Section 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the

16

exercise of First Amendment rights." <u>Jones</u>, 90 F.4th at 214 (internal quotation marks omitted). As Defendant concedes, "'a prison transfer or the threat of a transfer can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner'" (Docket Entry 43 at 7 (quoting and citing <u>Hill v. Lappin</u>, 630 F.3d 468, 474-75 (6th Cir. 2010))). <u>See also, e.g.</u>, <u>Jones</u>, 90 F.4th at 214 ("Prison officials certainly have broad latitude to relocate prisoners as needed for the purposes of prison administration and safety. But they may not violate the First Amendment by transferring a prisoner in retaliation for protected conduct. Additionally, a transfer or placement in a <u>more restrictive</u> or dangerous setting can constitute an adverse action." (emphasis added) (citations omitted)); <u>Moore v. Howard</u>, 410 F. Supp. 1079, 1080 (E.D. Va. 1976) ("Disciplining inmates for pursuing legal remedies to redress alleged abuses of their rights, either by a direct deprivation of privileges or by a denial of potentially available privileges, can similarly severely discourage them from effectively and appropriately utilizing the courts.").

Nevertheless, Defendant would have the Court grant summary judgment in her favor on the ground that:

> Plaintiff does not allege that his transfer to RCI had any foreseeable adverse effect on him other than that he would be unable to participate in SCC's work release program. Yet Plaintiff has no right to participate in a work release program. And such a consequence is thus, at best, *de minimis*.

17

> In short, any allegedly adverse action taken by
> [Warden] Shelton was *de minimis* and would not deter a
> person of ordinary firmness.

(Docket Entry 43 at 7-8 (citations omitted).)

Defendant's focus on Plaintiff's lack of entitlement to participation in the work release program misses the mark because the Fourth Circuit has made clear that a prisoner's transfer to "a more restrictive . . . setting," Jones, 90 F.4th at 214, "can constitute an adverse action," id., despite the fact that the prisoner otherwise lacks the right to remain in a less restrictive setting, see id. (recognizing "[p]rison officials[' ]broad latitude to relocate prisoners," but emphasizing that "transfer" to "more restrictive . . . setting can constitute an adverse action"). Moreover, although "a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a *de minimis* inconvenience to [the plaintiff's] exercise of First Amendment rights," Jones, 90 F.4th at 214 (internal quotation marks omitted), "[t]he de minimis threshold is intended to weed out only inconsequential actions," Blankenship v. Setzer, 681 F. App'x 274, 278 (4th Cir. 2017) (ellipsis and internal quotation marks omitted). And — as established by the Fourth Circuit — "a transfer . . . [to] a more restrictive . . . setting," Jones, 90 F.4th at 214, does not (as a matter of law) constitute "a de minimis inconvenience," id. (italics and internal quotation marks omitted), or "inconsequential action[]," Blankenship, 681 F. App'x at 278

18

(internal quotation marks omitted); rather, for purposes of a first-amendment retaliation claim, such transfer "can constitute an adverse action," Jones, 90 F.4th at 214.

Here, Plaintiff avers that the transfer deprived him of the ability to participate in the work release program, through which he earned $420 per month. (See Docket Entry 45-1, ¶¶ 20, 23.) By definition, incarceration without work release qualifies as "more restrictive," Jones, 90 F.4th at 214, than incarceration with work release. Plaintiff further avers that his loss of work release impaired his participation in MAPP, delaying his potential parole date. (See Docket Entry 45-1, ¶¶ 21-22.) Taken together, such consequences amount to "something more than a *de minimis* inconvenience," Jones, 90 F.4th at 214 (internal quotation marks omitted). See Watson v. Rozum, 834 F.3d 417, 423 (3d Cir. 2016) (deeming "loss of the ability to participate in prerelease programs, including work release," as "clearly more than de minimis consequences" (italics omitted)); see also, e.g., Weaver v. Graham, 450 U.S. 24, 33-34 (1981) (describing diminishment of opportunity "to shorten [prisoner's] time in prison" as "disadvantageous"); Brown v. Stapleton, 142 F.4th 252, 259 (4th Cir. 2025) (rejecting argument that inmate's "fifteen-dollar fine was so *de minimis* that it does not qualify as a deprivation" under Due Process Clause, explaining that "[f]ifteen dollars may be a sum of small consequence outside prison walls, but it is of great significance

19

within them[]"); <u>Webb v. Butler</u>, No. 5:18ct3127, 2024 WL 1309165, *6 & n.7 (E.D.N.C. Mar. 27, 2024) (explaining that, although complaints such as switch from weekly to biweekly haircuts qualified as de minimis, "the court cannot say that the loss of email privileges, a more hostile environment with less supervision, more lockdown time, and less access to natural light or recreation . . . constitute de minimis inconveniences"); <u>Moore</u>, 410 F. Supp. at 1080 ("Classification decisions . . . for work release in the correctional system[] should not be affected by an individual's efforts to petition the courts for a redress of grievances.").

Therefore, a reasonable fact-finder could determine that, "[v]iewed in the light most favorable to [Plaintiff], the facts in this case support the conclusion that the transfer was an adverse action," <u>Jones</u>, 90 F.4th at 215, on the ground that, at a minimum, "the combined effect of the[ foregoing] aspects of the transfer would likely deter a person of ordinary firmness from the exercise of First Amendment rights," <u>id.</u> (internal quotation marks omitted). <u>See also, e.g.</u>, <u>Hill</u>, 630 F.3d at 475 ("Being threatened with a transfer to a more restrictive living environment with fewer privileges would deter a person of ordinary firmness from exercising the constitutional right to file grievances.").

**C. Adverse Action**

Defendant further asserts that "Plaintiff has failed to show a causal connection between the filing of his grievance and the

20

transfer." (Docket Entry 43 at 8.) More specifically, Defendant contends:

> The only evidence Plaintiff offers of retaliation is that he "advised" [Warden] Shelton on November 7 and 14, 2021, that his constitutional rights were being violated, and that on November 17, 2021, he was transferred to RCI. That said, "temporal proximity" between an inmate's protected activity and the allegedly retaliatory official action "is simply too slender a reed on which to rest" a Section 1983 retaliation claim. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993). Indeed, the objective evidence shows that Plaintiff was transferred as part of a swap request *from another facility* in which he met all the criteria. Ex. 1. And, as discussed above, Plaintiff was attempting to use the dayroom for authorized services at an unauthorized time. And therefore, a transfer to maintain institutional authority would be for a legitimate penological purpose, related to protected First Amendment activity. *Id*[.]; [*Cochran*], 73 F.3d at 1317.

> Plaintiff has failed to sufficiently tie his act of writing to [Warden] Shelton to the transfer that he claims was instituted to retaliate for the complaints. Therefore, the Court should find that Plaintiff has failed to show the required causal link.

(Docket Entry 43 at 8-9 (emphasis in original).)

Contrary to Defendant's contentions, in the specific context of prisoner-asserted, first-amendment retaliation claims against prison officials, the Fourth Circuit recently reiterated that "temporal proximity alone can create the inference of causation." Hodges v. Meletis, 109 F.4th 252, 262 (4th Cir. 2024); see also Tobey v. Jones, 706 F.3d 379, 387 (4th Cir. 2013) (explaining that "[the] complaint most certainly sets forth a valid First Amendment retaliation claim" where "the temporal proximity of [the plaintiff's] peaceful protest and his arrest, unsupported by

probable cause, shows [the defendants] engaged in impermissible retaliation"). Of course, "[w]here a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close." Penley v. McDowell Cnty. Bd. of Educ., 876 F.3d 646, 656 (4th Cir. 2017).[8]

But here Plaintiff has come forth with evidence of very close temporal proximity by averring (A) that he wrote Defendant letters on November 7, 2021, and November 14, 2021, complaining about Sergeant Watson's order on October 30, 2021, regarding the removal of Plaintiff's religious materials (see Docket Entry 45-1, ¶¶ 14-16), and (B) that, "[o]n November 17, 2021, three days after [Plaintiff's] second letter to Warden Shelton, Warden Shelton ordered [Plaintiff's] transfer from Sanford Correctional Center to Richmond Correctional Institution" (id., ¶ 18; see also id., ¶¶ 19 (averring that, "[o]n November 17, 2021, a [DAC] officer removed [Plaintiff] from [his] work release assignment and brought [him] back to Sanford Correctional Center to prepare for the transfer"), 20 (averring that transfer resulted in loss of Plaintiff's "ability to participate in work release")). Such "temporal proximity . . . tends to show causation." Foster v. University of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015) (emphasis omitted); see also,

_____

8    Notably, Plaintiff does not rest his case merely on temporal proximity. (See, e.g., Docket Entry 45-1, ¶ 28 (emphasizing grievance responses connecting transfer to protected activity).)

22

e.g., Jones, 90 F.4th at 213 (concluding inmate satisfied causation prong where, inter alia, transfer occurred two days after officer who ordered transfer met with inmate regarding his grievances).[9]

As for Defendant's assertion that "the objective evidence shows that Plaintiff was transferred as part of a swap request from another facility" (Docket Entry 43 at 8-9 (emphasis omitted)), the grievance's unsworn statement to that effect does not sever the causal link. See, e.g., Reeves, 2011 WL 4499099, at *5 n.14; Bowman, 2011 WL 1167320, at *8 n.9.[10] Moreover, the initial response to Plaintiff's grievance explicitly linked Plaintiff's transfer to his religious activities and expression regarding religious discrimination. (See Docket Entry 45-1 at 10.) Even

---

9 Wagner does not undermine the foregoing analysis. In that decision, which involved allegations that an employer terminated an employee for reporting certain environmental problems, see Wagner, 13 F.3d at 88-89, the record reflected that the plaintiff had compiled an "extensive list of infractions and incidents of insubordination," id. at 91, as well as that, by the time the defendant recommended terminating the plaintiff's employment, the plaintiff's "job performance had become so dismal that his environmental reports played no substantial role in the decision to fire him," id. Further, the Wagner plaintiff "failed to muster any real evidence that the ostensibly legitimate reasons given for his termination were pretextual. The only argument [the plaintiff] advance[d] to show that his firing was in retaliation for his reports of environmental problems concerns the timing of those reports and the timing of certain reprimands he received for poor performance of his duties." Id. According to the Fourth Circuit, "[t]his temporal proximity . . . [wa]s simply too slender a reed on which to rest a Section 1983 retaliatory discharge claim." Id. (emphasis added).

10 The same principle applies to Defendant's assertion that "Plaintiff was attempting to use the dayroom for authorized services at an unauthorized time" (Docket Entry 43 at 9).

23

setting aside this explicit connection, the shifting explanations for Plaintiff's transfer undermine Defendant's position. See, e.g., Jones, 90 F.4th at 213 ("[The d]efendants' alternate explanation for the transfer has shifted over time, creating doubt as to the veracity of that explanation."). Accordingly, at least at this stage of the proceedings, Defendant cannot secure judgment as a matter of law on the causation aspect of Plaintiff's retaliation claim. See id.

## D. Qualified Immunity

As a final matter, Defendant contends that qualified immunity shields her from Plaintiff's claim. (See Docket Entry 43 at 9-10.) "Qualified immunity protects government officials from civil liability and suit insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Jones, 90 F.4th at 207 (internal quotation marks omitted). "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first (constitutional right) prong, and the officer bears the burden on the second (clearly established) prong." Id. (brackets and internal quotation marks omitted). Yet, aside from recounting general qualified immunity principles (see Docket Entry 43 at 9-10), Defendant limits her argument to the following:

> In this case, [Warden] Shelton did not violate
> Plaintiff's constitutional rights. Still, even if

24

Plaintiff's constitutional rights were violated, those constitutional rights were not clearly established.

(Id. at 10.) This bald assertion fails to satisfy Defendant's burden.

Indeed, strictly speaking, Defendant waived her qualified immunity argument. See, e.g., Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument . . . by failing to develop [its] argument — even if [its] brief takes a passing shot at the issue." (internal quotation marks omitted) (brackets in original)); see also Hensley on behalf of N.C. v. Price, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (explaining that "a party must do more than take a passing shot at an issue to properly preserve it" and that "[t]he party must actually develop its argument" and finding waiver where "[the defendants'] opening brief contains none of the development required," as it contained "no argument on the 'clearly established' prong of the qualified immunity test" and "no citation to cases actually applying the 'clearly established' prong of the qualified immunity test" (brackets and certain internal quotation marks omitted)). Further, the Opposition argues that the implicated rights qualified as clearly established (see Docket Entry 45 at 20-22), arguments that Defendant conceded by failing to reply thereto, see, e.g., Kinetic, 2010 WL 1667285, at *8.

Regardless, "[i]t is beyond dispute that prison officials cannot retaliate against inmates for exercising a constitutional

25

right." <u>Booker v. South Carolina Dep't of Corr.</u>, 855 F.3d 533, 543 (4th Cir. 2017). More importantly, long before the incident at issue here, the Fourth Circuit recognized that "an inmate's First Amendment right to be free from retaliation for filing a grievance was clearly established." <u>Id.</u> at 546; <u>see also, e.g.</u>, <u>Jones v. Bailey</u>, No. 7:16cv469, 2018 WL 1513297, at *10 (W.D. Va. Mar. 27, 2018) ("It was clearly established as of October 2014 that inmates have a constitutional right to be free from retaliation for filing prison grievances and for practicing their religions."). And even more significantly, as of at least 2015, "it was clearly established that transferring a prisoner to another institution in retaliation for the prisoner filing a grievance violated his First Amendment rights." <u>Jones</u>, 90 F.4th at 216.

## CONCLUSION

Defendant has not established her entitlement to summary judgment.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 42) be denied.

This 13th day of August, 2025.

/s/ L. Patrick Auld<br>
**L. Patrick Auld**<br>
**United States Magistrate Judge**